Isaac N. Sutphin, P.C. (Wyo. State Bar #6-3711)
Colton R. Edwards (Wyo. State Bar #8-7289)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
INSutphin@hollandhart.com
CREdwards@hollandhart.com

*ATTORNEYS FOR PLAINTIFF*
*KVW CONSULTING, LLC*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| KVW CONSULTING, LLC, a Kentucky limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>TERRA MINT GROUP, CORP. d/b/a REALBRICKS, a Wyoming corporation; and CHRISTOPHER R. GERARDI, an individual,<br><br>Defendants. | Civil Action No. |

## COMPLAINT AND JURY DEMAND

KVW Consulting, LLC (**"KVW"** or **"Plaintiff"**) complains of Defendants Terra Mint Group, Corp. d/b/a Realbricks (**"Realbricks")** and Christopher R. Gerardi **("Gerardi,"** and collectively with Realbricks, **"Defendants")** and states as follows:

## PARTIES

1. Plaintiff KVW is a limited liability company organized and existing under the laws of the State of Kentucky. The members of KVW reside in the State of Kentucky.

2. Upon information and belief, Defendant Realbricks is a corporation organized and existing under the laws of the State of Wyoming.

3. Upon information and belief, Defendant Gerardi is an individual residing and domiciled in Nebraska.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 exclusive of interest and costs, and KVW, on the one hand, and Realbricks and Gerardi, on the other hand, are citizens of different states.

5. This Court has general personal jurisdiction over Realbricks because Realbricks is a corporation organized and existing under the laws of the State of Wyoming, is authorized to do and is doing business in the State of Wyoming, and is a citizen of the State of Wyoming.

6. This Court has specific personal jurisdiction over Gerardi because Gerardi purposefully directed activities giving rise to the claims in this Complaint toward Wyoming, and KVW's claims against Gerardi arise out of and relate to Gerardi's contacts with Wyoming.

7. Venue for this action is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) as Realbricks resides in this judicial district and this judicial district is where a substantial part of the events or omissions giving rise to the claims contained herein occurred.

## GENERAL ALLEGATIONS

8. Realbricks is a real estate technology company and online fractional real estate investing marketplace.

9. KVW is a business consulting firm.

10. On or about September 27, 2024, KVW and Realbricks entered into an agreement whereby KVW would advise Realbricks on strategic overview, including capital and financing structures, product development and business plans.

11. The parties contemplated that the renumeration due and owing to KVW for the services it was to provide in relation to the strategic overview would be a one-time payment in the amount of $7,500.

12. On or about November 1, 2024, the agreement was amended to provide flat fee compensation of $6,500 per month for services, including the negotiation of partnership agreements and assistance regarding the raising of capital and general business advice.

13. In early 2025, KVW – including its member and principal Ken Waters **("Waters")** – increased its devotion of time and, therefore, the compensation to KVW under the agreement increased to $10,000 per month.

14. In May 2025, the monthly compensation was increased to $15,000 per month without any other meaningful changes to the agreement, but upon Realbricks' request that Waters not take on any new clients so he could be available at all times to Realbricks.

15. The reason for the compensation increase was tied to the allocation of more time and the fact that the services being provided by KVW were valuable and appreciated by Realbricks. Indeed, up to this point Realbricks had never expressed any dissatisfaction whatsoever with the services being provided by KVW.

16. On or about November 1, 2025, the parties' agreement was revised yet again to include a 2% commission for the sale of Realbricks or an initial public offering to include services related to advising on strategic overview, including capital and financing structures, product

development and business planning on behalf of the company to assist with raising capital and managing the company's shareholders. Pursuant to this amended agreement, KVW—including Waters—was to report to the chief executive officer and president of Realbricks, Defendant Gerardi**.**

17. Then, between November 2025 and April 2026 Gerardi began voicing complaints about the amount of bonuses due and owing to Waters because he thought they were excessive, but he did not articulate any reason why such bonuses were not due and owing.

18. In response to Gerardi's complaints about his bonuses, Waters agreed to forego any further bonuses in exchange for a longer-term contract with Realbricks.

19. To accommodate Gerardi's subjective concerns, the parties then entered into yet another agreement on or about April 10, 2026 (the **"April 2026 Contract").**

20. Per Paragraph 13.1 of the April 2026 Contract, the April 2026 Contract "supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter."

21. Per Paragraph 2 of the April 2026 Contract, "[t]he term of this Agreement is From April 1, 2026 ('Effective Date') and shall continue for an initial term of two (2) years, to March 31, 2028 ('Term'), unless earlier terminated in accordance with Section 9 ('Term and Termination'). At the expiration of the Term, the Parties will mutually evaluate extending the relationship between the Parties. Any extension of the Term shall be subject to mutual written and signed agreement between the Parties."

22. The compensation due and owing to KVW under the April 2026 Contract is clearly set forth in Paragraph 3 of the April 2026 Contract, which provides in relevant part:

> 3.1 As compensation for the Services and the rights granted to [Realbricks] in this Agreement, [Realbricks] shall pay to [KVW] a rate of Fifteen

> Thousand and 00/100 US Dollars ($15,000.00) per month on or around the 18th of each month for the Term of this Agreement . . . [KVW] shall also receive 125,000 shares of common stock in [Realbricks], vesting monthly at the rate of 5,208 shares during the Term of this Agreement.
>
> 3.2 In addition, in the event [Realbricks] successfully publicly trades its stock through a stock exchange via an Initial Public Offering during the Term of this Agreement, [KVW] shall receive 125,000 shares of common stock in [Realbricks] and One Hundred Fifty Thousand and 00/100 US Dollars ($150,000.00 USD).

23. Further, Paragraph 9 of the April 2026 Contract, entitled "Termination," provides in relevant part:

> [Realbricks] may terminate this Agreement for "Cause", effective upon thirty (30) days written notice to [KVW], in the event that [KVW] breaches this Agreement including, without limitation, being unresponsive to [Realbricks'] communications, failing to meet any milestones or other objectives established by [Realbricks], or a breach of the Roles and Responsibilities in Schedule 1 described below, and such breach is incapable of cure, or with respect to a breach capable of cure, [KVW] does not cure such breach within ten days after receipt of written notice of such breach.

24. Paragraph 13.3 of the April 2026 Contract further contains a Wyoming choice of law and venue provision, which provides:

> This Agreement shall be governed by and construed in accordance with the internal laws of the State of Wyoming without giving effect to any choice or conflict of law provision or rule. Each Party irrevocably submits to the exclusive jurisdiction and venue of the federal and state courts located in the State of Wyoming in any legal suit, action or proceeding arising out of or based upon this Agreement or the Services provided hereunder.

25. Further, as an inducement and in consideration for Waters' agreement to forego further bonuses, KVW and Gerardi entered into a separate stock purchase agreement whereby Gerardi agreed to grant KVW an option to purchase his personally held 125,000 shares in Realbricks at a $9 million valuation (the "**Stock Purchase Agreement**"). The option was valid for

one year, however, in the event Realbricks was sold or an initial public offering occurred, KVW would have to exercise the option within thirty days.

26. While Gerardi never actually signed the Stock Purchase Agreement, various emails exist clearly demonstrating that Gerardi agreed to the terms of the Stock Purchase Agreement.

27. On or about July 14, 2026, Gerardi contacted Waters and explained that Realbricks' Galen Peterson ("**Peterson**")—whom upon information and belief was brought on to the company to assume many of the responsibilities of Waters—did not like the terms of the April 2026 Contract. Specifically, Peterson was purportedly unhappy that Waters was making more money than Peterson in compensation. Gerardi requested that Waters agree to reduce his compensation under the April 2026 Contract from $15,000 $10,000 per month.

28. Subsequently on or about July 20, 2026, Waters had a telephone conversation with Peterson. During this conversation, Peterson did not deny the binding nature of the April 2026 Contract. Rather, Peterson claimed that Waters was being overpaid, and his compensation should be limited to just $5,000 per month, in complete contravention of the clear compensation terms found in Paragraph 3 of the April 2026 Contract. Peterson also stated he did not see Waters' value and complained about a lack of definition of services and reporting requirements. Importantly, however, Peterson did not claim that the April 2026 Contract was unenforceable and he further admitted that no cause existed for terminating the April 2026 Contract.

29. Waters disagreed with Peterson's position and rejected Peterson's proposal.

30. Despite Peterson's alleged misgivings, KVW and Waters continued to perform all of the services contemplated under the April 2026 Contract with the exception of the sale of Realbricks.

31. Later in the afternoon of July 20, 2026, Peterson sent a lengthy email outlining a potential settlement between KVW and Realbricks. Waters and Peterson discussed a payment of $150,000 in total, but Peterson proposed a breakdown of $50,000 over time and 100,000 shares. Given Realbricks' history of not paying notes or debt, however, Waters rejected Peterson's proposal.

32. Following Peterson's email, Waters and Gerardi had a telephone conversation, during which Waters proposed a settlement consisting of a payment of $75,000 at signing, a second payment of $75,000 in March 2027, and 175,000 vested shares of Realbricks.

33. On or about July 26, 2026, Gerardi rejected Waters' settlement proposal. However, the parties reached a verbal agreement contemplating a $50,000 payment at signing, $105,000 in cash over 12 months and 135,000 shares. However, this agreement was quickly followed by Realbricks' retraction of the offer on or about July 27.

34. Then, on or about July 31, 2026, Gerardi sent an email to Waters providing an offer consisting of a payment in the amount of $50,000 in cash, $5,000 per month and 135,000 shares of stock. Gerardi, however, insisted that Waters respond to the offer in less than three hours.

35. Later on July 31, 2026 following expiration of Gerardi's self-imposed response deadline, to Waters' great surprise Waters received an email terminating the April 2026 Contract. The termination, however, provided no cause whatsoever for the termination, in direct contravention of Paragraph 9 of the agreement. Realbricks also provided absolutely no opportunity to cure any alleged breach on the part of KVW, again in direct contravention of Paragraph 9.

36. Further, it subsequently became apparent to KVW and Waters that Peterson had taken over Waters' duties under the April 2026 Contract prior to Realbricks purporting to terminate the agreement.

37. Later, on August 31, 2026, counsel for Realbricks sent correspondence to counsel for KVW and, for the first time, Realbricks took the position that KVW was terminated for cause "based on conduct incapable of cure, including material misrepresentations and invoicing for government relations results that did not occur."

38. Specifically, Realbricks alleged that: (i) Waters made false statements to Realbricks' lead investor, Mr. Gene Fredrick ("**Fredrick**"), that Realbricks' platform could be used to invest Trump Account 530A funds; (ii) Waters provided fabricated government relations results pertaining to a federal housing bill; (iii) Waters structured an agreement between Realbricks and NexGen Calls, LLC ("**NexGen**"), but that NexGen was not a legitimate company; and (iv) Waters drafted a May 2026 memorandum of understanding with D.R. Horton which identified "Realbricks, Inc."—a nonexistent entity—as the contracting party; introduced an undefined third party, Apex, Inc., on which a $1,200,000 funding commitment was conditioned; left material terms blank; stated that the agreement was effective upon conditions met without stating any conditions; and contained no term, termination, confidentiality, or binding effect provisions.

39. However, none of the allegations in the August 31 letter regarding Waters' conduct were accurate and, instead, they constituted mere pre-text for Realbricks to terminate the April 2026 Contract without justification.

40. Indeed, contrary to Realbricks' position, Waters never made any false statements to Fredrick that Realbricks' platform could be used to invest Trump Account 530A funds. Instead, Waters met with one individual at Turning Point USA and one individual in the Trump administration to highlight Realbricks' eligibility for the 530A program. Waters warned these individuals that the bill was not favorable and also warned that President Trump may not wish to put his name on the bill.

41. Ultimately, Congress passed the bill without President Trump's signature.

42. Moreover, contrary to Realbricks' position, NexGen is a fully operating company which has been in existence for over a decade.

43. Further, in May 2026 Waters attended a meeting in Dallas with Realbricks and D.R. Horton. Gerardi requested that Waters draft a memorandum of understanding within a few days of the meeting and, in fact, the day Waters returned from Dallas. Waters agreed to summarize the agreements the parties discussed at the meeting, and then sent a draft to Gerardi directing him to forward the draft onto Peterson to complete. Waters referred to "Realbricks" in the draft because it is the dba of Terra Mint Group, Corp., but this was corrected in a subsequent draft.

44. Moreover, in drafting the memorandum of understanding Waters was not acting in the capacity of an attorney. Specifically, Waters' contract with Realbricks did not call for him to provide legal services, and Realbricks had no less than four of its own lawyers providing legal services on its behalf.

45. Further, Peterson requested that Waters undertake specific tasks during his meetings with individuals in Washington D.C. The trip was pre-planned and approved with Realbricks' prior knowledge that Waters was not a lobbyist, nor representing Realbricks as its attorney. Realbricks agreed to reimburse Waters for trip expenses, and this was not conditioned on any outcomes achieved by Waters. Despite this, Realbricks later took the position that Waters had been acting in the capacity of a lobbyist and refused to pay for Waters' trip expenses in the amount of $952.77.

46. Tellingly, in September 2026 Fredrick denied to Waters that KVW had made any misrepresentations or had engaged in any misconduct whatsoever and, in fact, stated that he had a good relationship with Waters. Fredrick also stated that he personally had no involvement with

Realbricks' purported termination of KVW. Further, Fredrick has continued to invest under the same terms and conditions.

47. Waters and Fredrick continue to have a good relationship. In fact, Fredrick invited Waters to Puerto Rico to play golf, and has expressed to Waters that he is looking forward to working together on future deals.

48. In light of the foregoing, and contrary to Realbricks' stated position, Realbricks did not have legitimate cause to terminate the April 2026 Contract and, even if it did, it failed to provide KVW with an opportunity to cure any alleged breaches in direct violation of the plain terms of the contract. Moreover, Realbricks' position that the alleged breaches were "incapable of cure" is disingenuous and merely an attempt to explain a blatant breach of the April 2026 Contract on the part of Realbricks.

49. Moreover, despite Gerardi's attorney circulating a Docusign version of the Stock Purchase Agreement for Gerardi's signature and promising Waters that Gerardi would sign it, Gerardi never did sign the agreement and Gerardi has refused to allow KVW to exercise its option under the Stock Purchase Agreement, in direct breach of the agreement.

## FIRST CAUSE OF ACTION
**(Breach of Contract)**
**Against Realbricks**

50. KVW incorporates all previous paragraphs of this Complaint as if fully set forth herein.

51. The April 2026 Contract is a valid, binding and enforceable contract.

52. At all times relevant, KVW performed all of its duties and obligations under the April 2026 Contract.

53. On the other hand, in purportedly terminating the April 2026 Contract without legitimate cause and without providing an opportunity to cure any alleged breach on the part of KVW, Realbricks failed to satisfy its duties and obligations under the April 2026 Contract, thus breaching the April 2026 Contract.

54. Realbricks' breach constitutes a material breach.

55. As a direct and proximate result of Realbricks' breach of the April 2026 Contract, KVW has suffered damages in an amount to be proven at trial, but in no event less than $300,000 plus the value of the 125,000 shares due and owing to KVW under the April 2026 Contract.

**SECOND CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**Against Realbricks**

56. KVW incorporates all previous paragraphs of this Complaint as if fully set forth herein.

57. Wyoming law follows the Restatement (Second) of Contracts § 205, which states that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

58. The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement.

59. A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance and fails to afford the non-breaching party the opportunity to obtain the benefit of the bargain.

60. The April 2026 Contract imposed upon Realbricks a duty of good faith and fair dealing in its performance and its enforcement.

61. In purportedly terminating the April 2026 Contract without providing legitimate cause and without providing an opportunity to cure any alleged breach on the part of KVW, Realbricks violated the implied covenant of good faith and fair dealing because it injured the rights of KVW to receive the benefits of the April 2026 Contract.

62. Moreover, Peterson's conduct in taking over Waters' duties under the April 2026 Contract prior to its purported termination constitutes a further violation of the implied covenant of good faith and fair dealing.

63. As a direct and proximate result of Realbricks' breach of the implied covenant of good faith and fair dealing, KVW has suffered damages in an amount to be proven at trial, but in no event less than $300,000 plus the value of the 125,000 shares due and owing to KVW under the April 2026 Contract.

**<u>THIRD CAUSE OF ACTION</u>**
**(Breach of Contract)**
**Against Gerardi**

64. KVW incorporates all previous paragraphs of this Complaint as if fully set forth herein.

65. The Stock Purchase Agreement between KVW and Gerardi is a valid, binding and enforceable contract.

66. At all times relevant, KVW performed all of its duties and obligations under the Stock Purchase Agreement.

67. On the other hand, in refusing to sign the Docusign agreement and in refusing to allow KVW to exercise its option under the Stock Purchase Agreement, Gerardi failed to satisfy his duties and obligations under the Stock Purchase Agreement, thus breaching the Stock Purchase Agreement.

68. Gerardi's breach constitutes a material breach.

69. As a direct and proximate result of Gerardi's breach of the Stock Purchase Agreement, KVW has suffered damages in an amount to be proven at trial, but in no event less than the value of the 125,000 shares referenced in the Stock Purchase Agreement.

**FOURTH CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**Against Gerardi**

70. KVW incorporates all previous paragraphs of this Complaint as if fully set forth herein.

71. Wyoming law follows the Restatement (Second) of Contracts § 205, which states that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

72. The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement.

73. A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance and fails to afford the non-breaching party the opportunity to obtain the benefit of the bargain.

74. The Stock Purchase Agreement imposed upon Gerardi a duty of good faith and fair dealing in its performance and its enforcement.

75. In purportedly refusing to sign the Docusign agreement and refusing to allow KVW to exercise its option under the Stock Purchase Agreement, Gerardi violated the implied covenant of good faith and fair dealing because he injured the rights of KVW to receive the benefits of the Stock Purchase Agreement.

76. As a direct and proximate result of Gerardi's breach of the implied covenant of good faith and fair dealing, KVW has suffered damages in an amount to be proven at trial, but in no event less than the value of the 125,000 shares referenced in the Stock Purchase Agreement.

## PRAYER FOR RELIEF

WHEREFORE, KVW prays for judgment in its favor and against Realbricks and Gerardi, jointly and severally, for a just amount together with pre- and post-judgment interest and costs as follows:

77. For compensatory damages in an amount to be proven at trial, but in no event less than $300,000 as against Realbricks, plus the value of the 125,000 in shares due and owing to KVW under the April 2026 Contract and the Stock Purchase Agreement as against both Realbricks and Gerardi.

78. For attorneys' fees and costs to the maximum extent allowed by law; and

79. For all other and further relief as the Court deems just and appropriate.

## JURY DEMAND

KVW demands trial by jury on all issues so triable.

DATED this 15th day of October, 2026.

*/s/ Isaac N. Sutphin*
Isaac N. Sutphin, P.C. (Wyo. State Bar #6-3711)
Colton R. Edwards (Wyo. State Bar #8-7289)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
INSutphin@hollandhart.com
CREdwards@hollandhart.com

ATTORNEYS FOR PLAINTIFF
KVW CONSULTING, LLC